**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **United States of America** | : | |
| | : | |
| **v.** | : | **No. 3:18-CR-274-VLB-1** |
| | : | |
| **JOSE PEREZ** | : | |
| | : | **DECEMBER 20, 2021** |
| | : | |

<u>**MEMORANDUM OF DECISION ON**</u>
<u>**DEFENDANT'S MOTION FOR NEW TRIAL [DKT. 136] AND**</u>
<u>**MOTION FOR JUDGMENT OF ACQUITAL [DKT. 137]**</u>

Before the Court is the Defendant's, Jose Perez, Motion for a New Trial; [Mot. for. New Trial, Dkt. 136]; and Motion for Judgment of Acquittal; [Mot. for J. of Acquittal, Dkt. 137]. On September 24, 2021, following a jury trial, the Defendant was found guilty of Unlawful Possession of a Firearm by a Felon a violation of 18 U.S.C. § § 922(g)(1) and 924(a)(2). The only element of the offense conduct that was in dispute at trial was whether the Defendant knowingly possessed the firearm and ammunition as specified in the indictment.

The Defendant now moves for an acquittal in accordance with Federal Rule of Criminal Procedure 29 arguing that, on the evidence presented at trial and assuming the credibility of all witnesses presented by the Government, no reasonable jury could find guilt beyond a reasonable doubt. In the alternative, the Defendant argues the Court should grant him a new trial pursuant to Rule 33 based on the weakness of the Government's case, combined with certain representations made by the prosecutor during rebuttal argument that may have misled the jury. The Government opposes.

For the following reasons, the Court DENIES both Defendant's motions.

1

I.     BACKGROUND

Officer Steven Chesworth, a patrol officer with the Hartford Police Department, testified that on November 13, 2016 around 11:20PM he received a dispatch to respond to a shots fired report at 105–107 Franklin Avenue in Hartford, Connecticut.  [Trial Tr. vol. 1, 16–20, Dkt. 139].  The report came from a ShotSpotter report indicating gun shots were fired within the area.  [*Id.* at 18–19].  Within minutes, Officer Chesworth arrived with another officer, who were both in  separate patrol vehicles.  [*Id.* at 19, 23].  The officers began to canvas the area, which is a mix residential and business area approximately two houses away from the Alpine Café.  [*Id.* at 22–23].

Christian Molina testified that on that night he was sitting in his parked car on Franklin Street, near the Alpine Café, waiting for a friend who went into a nearby residential building.  [*Id.* at 50, 53].  Molina testified he heard gun shots from nearby, then observed a gray car pull out of a nearby driveway and park in front of the Alpine Café. [*Id.* at 53, 55–56].  He further testified that he saw the person driving the gray car walk into the Alpine Café.  [*Id.* at 56–57].  Molina described the driver of the gray car as approximately 5' 7'', 180 pounds and was wearing a hat and sweater, but he was unable to see the driver's face and could not tell his ethnicity. [*Id.* at 56–57]. Molina thought what he observed was suspicious because the vehicle drove a short distance between the driveway it pulled out of and the Alpine Café, which was within walking distance of each other.  [*Id.* at 57–58].

Molina then saw Officer Chesworth and flagged him down to inform him of what he saw.  [*Id.* at 24–26].  Officer Chesworth testified that Molina told him that

2

he observed the vehicle pull in front of Molina's car, park, and then saw the driver walk across the street towards the Alpine Café.  [*Id.* at 26].  Molina then pointed out that the suspicious vehicle he saw was still parked on the street across from the Alpine Cafe.  [*Id.* at 26–27].  That vehicle was an Acura RSX.  [*Id.* at 26].  Officer Chesworth testified that Molina gave a "vague" description of the person he saw leaving the vehicle as someone with a black hat and a gray sweatshirt.  [*Id.* at 44].  Officer Chesworth searched the area, including going into the Alpine Café, to find someone who matched the description given by Molina but did not locate anyone matching that description.  [*Id.* at 26–28].

The officers looked inside the vehicle and observed a firearm on the passenger side floor.  [*Id.* at 27].  The doors on the vehicle were locked and the windows were rolled up, but the sunroof was cracked open "a couple of inches." [*Id.* at 28].  Officer Chesworth then used a very thin lockout tool, threaded through the cracked open sunroof, to "pop the door."  [*Id.* at 29, 46].  After popping the door, the car alarms went off, prompting the officers to stop for a moment and observe whether anyone was going to come out and claim ownership of the vehicle, but no one did.  [*Id.* at 29].  The officers ran the car information to identify the registered owners, which came back to a Jose Perez at 37-A Lisbon Street.  [*Id.* at 30–31].

Officer Chesworth put on some gloves, removed the firearm—a Smith & Wesson .357 revolver—, and inspected the cylinder of the revolver finding four live rounds and two spent shell casings.  [*Id.* at 31, 36].  Officer Chesworth checked to see who the firearm was registered to, discovering it was registered to a then-deceased Manual Robles from New Britain, Connecticut.  [*Id.* at 37].  The officers

then had the vehicle towed for further investigation by the Hartford Police's Shooting Task Force. [*Id.* at 38].

Officer Chesworth sent an assisting unit to go to 37-A Lisbon Street, which again is the address of the vehicle's listed registered owner (the Defendant). [*Id.* at 39]. The assisting unit spoke with a woman who answered the door at this address, who said her son let a friend use that address as a mailing address and she did not know where either her son or the Defendant were. [*Id.*]. Officers were unable to locate the Defendant that night.

On November 26, 2016, Detective Christopher Reeder, a detective with the Hartford Police Department then-assigned to the Shooting Task Force, was assigned to investigate this case. [*Id.* at 110, 113]. On December 13, 2016, Detective Reeder contacted Molina regarding the case and thereafter brought him in person to discuss the case and to conduct a photo array. [*Id.* at 119–20]. Molina was unable to identify the person he saw driving the gray car with the photo array. [*Id.* at 58].

Detective Reeder applied for, and was subsequently granted on January 5, 2017, a search and seizure warrant for the Acura RSX. [*Id.* at 123–24; Gov.'s Ex. 5 at 1]. On January 12, 2017, Detective Matthew Larrivee of the Hartford Police Department processed the Acura RSX. [Trial Tr. vol. 1 at 80, 84–85]. Detective Larrivee was unable to process the vehicle for fingerprints, DNA, or gunshot residue because the interior of the vehicle was saturated with water, having been stored in an open impound lot for approximately two months with its sunroof open. [*Id.* at 88]. Detective Larrivee was able to recover several documents contained

4

within the closed glove box, which was protected from the elements.  [*Id.* at 92–99].

The contents of the glove box included:

> (1) a Connecticut registration certificate addressed to Jose M. Perez with a print date of September 24, 2014 and an expiration date of September 24, 2016 for the vehicle; [Gov.'s Ex. 6A];

> (2) a Connecticut registration certificate addressed to Jose M. Perez with an expiration date of September 24, 2018 for the vehicle; [Gov.'s Ex. 6B];

> (3) a Connecticut insurance identification card addressed to Jose M. Perez with an effective date of March 19, 2016 and an expiration date of September 9, 2016; [Gov.'s Ex. 6C];

> (4) a Connecticut emissions test notice for the vehicle addressed to Jose Perez with a date of August 31, 2015; [Gov.'s Ex. 6D];

> (5) a DMV vehicle inspection report showing the vehicle passed inspection on December 28, 2015, over two months after its due date; [Gov.'s Ex. 6E]; and

> (6) a letter from a company name beginning with "access" addressed to Wilfredo Marquez at 944 Asylum Avenue, Apt. A5, Hartford, CT dated November 2, 2016; [Gov.'s Ex. 6L].

[*Id.*].

Detective Reeder also applied for a search and seizure warrant to process the firearm, which he received.  [*Id.* at 123–24].  On January 12, 2017, Detective Candace Hendrix with the Hartford Police Department processed the firearm for latent prints and contact DNA.  [*Id.* at 126].  Using a sterile DNA swab, Detective Hendrix swabbed several areas of the firearm including the grip, trigger, and cylinder.  [*Id.* at 127].  She secured the DNA swab sample in the Hartford Police Property Room.  [*Id.*].  She was unable to locate any areas on the firearm with usable latent prints.  [*Id.*].

DNA testing was performed on the swab and analyzed by Steven Bryant with the Connecticut State Forensic Laboratory. [*Id.* at 140–41, 160–62, 68]. Mr. Bryant testified that his analysis of the DNA profile on the swab showed there were four contributors. [*Id.* at 162]. Of the four contributors, the likelihood that one of the four contributors was the Defendant was "100 billion times more likely" it was him, which is the ceiling for reporting likelihood ratios for the Connecticut State Forensic Lab. [*Id.* at 163–64]. Mr. Bryant testified that because the swabbing was for all three areas of the firearm, he could not testify to what part of the firearm the DNA associated with the Defendant was present. [*Id.* at 169]. For example, he could not testify how much of the DNA associated with the Defendant was found on the cylinder as compared to the trigger, if any at all. Mr. Bryant also conducted proportional analysis and determined that 85% of the DNA mixture was from the contributor associated with the Defendant. [*Id.* at 164]. Mr. Bryant testified that the DNA distribution analysis is based only on the portion of the swab cut for the DNA test and that the distribution may be different if another portion of the swab was analyzed. [*Id.* at 170].

An important aspect of the DNA testimony brought during trial related to how DNA is transferred onto objects, how much DNA is present on objects, and whether object to object DNA transfers can occur. Mr. Bryant testified that DNA can be transferred by simply touching an item, and the amount of DNA from touching can depend on various factors such as the amount of touching, the surface friction of an object, and the amount of cells sloughed off the donor transferring DNA. [*Id.* at 148–49]. Mr. Bryant testified that some people can slough, or shed, more skin cells

than others based on that person's own characteristics, such as if they are a very sweaty person.  [*Id.* at 176].

Mr. Bryant also testified about secondary DNA transfers, which generally provides that DNA from one donor can pass to one person or object and then pass to another person or object with the second interaction being a secondary transfer. [*Id.* at 150–51].   Mr. Bryant testified that the amount of DNA found from a secondary transferor when compared to a direct transferor is expectingly less, specifically stating "I haven't seen an example where the primary toucher has less DNA than the secondary person" and "[t]ypically . . . the initial touching is going to give more DNA."  [*Id.* at 151–52, 182].  He did testify that it was possible, but "in general, [he] would think the direct touching is going to transfer more of that individual's DNA." [*Id.* at 152].

Mr. Bryant also testified about the impact environment has on DNA profiles. He testified that DNA can linger on an object for quite some time, even up to years, depending on environmental factors.  [*Id.* at 153, 179].  The best conditions for longer lasting DNA are an indoor dry, cool environment.  [*Id.*].

Law enforcement was able to connect the DNA on the firearm with a CODIS[1] profile for the Defendant.  [*Id.* at 128–29].  At some point prior to trial, a confirmatory buccal swab of the Defendant's DNA was taken.  [*Id.* at 136].  The Defendant

---

[1] CODIS is the Combined DNA Index System, which "is the generic term, used to describe the FBI's program of support for criminal justice DNA databases as well as software used to run these databases." *Frequently Asked Questions on CODIS and NDIS*, FBI.Gov, available at: https://www.fbi.gov/services/laboratory/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited Dec. 10, 2021).

appeared to provide this swab on his own without his counsel present, and was cooperative with the process.  [*Id.*].

Detective Reeder investigated  the identity of the  legal registered  owner of the firearm, determining that the last registered owner was Manual Robles of New Britain, Connecticut.  [*Id.* at 121–22].  Mr. Robles passed away in 2009.  [*Id.*].  The firearm was not reported lost or stolen.  [*Id.*].  Detective Reeder was unable to find any connection between Mr. Robles and the Defendant.  [*Id.*].

Detective Reeder also investigated persons named  Wilfredo Marquez, the name on the most recent document found within the glove box of the Acura.  [*Id.* at 123].  The only evidence introduced about Mr. Marquez was that he lived at the same address as one of the Defendant's reported addresses.  [*Id.*].

In November 2018, the Defendant was indicted by a federal grand jury for one count of unlawful possession of a firearm and ammunition by a felon.  [*Id.* at 129–31].  Detective Reeder made several attempts to locate the Defendant to no avail.  [*Id.*]. The Defendant was ultimately arrested and proceeded to trial in September 2021.

## II.    MOTION FOR ACQUITTAL

### A. <u>Legal Standard</u>

"If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(2).  "[A] district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of

fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) (citing to *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979)). "[T]he court must be careful to avoid usurping the role of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Id.* at 130 (quoting *United States v. White,* 673 F.2d 299, 301 (10th Cir. 1982)).

> Viewing the evidence in the light most favorable to the government means " 'crediting every inference that the jury might have drawn in favor of the government,' " *United States v. Temple,* 447 F.3d at 136–37 (quoting *United States v. Walker,* 191 F.3d 326, 333 (2d Cir.1999)), and recognizing that the government's evidence need not exclude every other possible hypothesis, *see, e.g., United States v. Espaillet,* 380 F.3d at 718; *United States v. Martinez,* 54 F.3d 1040, 1043 (2d Cir.), *cert. denied,* 516 U.S. 1001, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995); *United States v. Ragosta,* 970 F.2d 1085, 1090 (2d Cir.), *cert. denied,* 506 U.S. 1002, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992). As "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence," *United States v. Jackson,* 335 F.3d at 180, when there are such competing inferences, we must defer "to the jury's choice," *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir. 1998).

*United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)

A "jury's verdict may rest entirely on circumstantial evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). "When making a case based on circumstantial evidence, the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States,* 348 U.S. 121, 139 (1954). A court may only grant acquittal where "there is 'no evidence upon which a reasonable mind might fairly conclude guilt

beyond a reasonable doubt.'" *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021) (quoting *United States v. Irving,* 452 F.3d 110, 117 (2d Cir. 2006)).

"A defendant who challenges the sufficiency of the evidence to support his conviction 'bears a heavy burden.'" *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Finley,* 245 F.3d 199, 202 (2d Cir. 2001)).

B. <u>Discussion</u>

The Defendant argues that "a reasonable juror, considering the testimony of the Government's witnesses, and assuming that each witness was credible, must have had a reasonable doubt about whether the prosecution proved guilt beyond a reasonable doubt."  [*Id.*].  As stated above, the only disputed element of the offense charged was whether the Defendant possessed the firearm and ammunition charged in the indictment on November 13, 2016.

The Defendant's motion attacks the verdict by parsing through the evidence presented, and the lack thereof, to suggest that after taking into consideration his competing view of the evidence, the jury could not find guilt beyond a reasonable doubt.  This includes the Defendant's pointing to a lack of evidence in the form of an eyewitness identification placing him in or near the Acura on November 13, 2016.  In addition, the Defendant argues that the evidence collected from the Acura supports an inference that he was not the last user of the vehicle because the registration and insurance expired, and the last piece of documentation was addressed to someone other than himself.  The Defendant also attacks the DNA evidence by suggesting that the DNA associated with him was transferred to the gun by a means other than his direct touching and the proportion value might be

different if retested using a different portion of the swab.  The Defendant concludes from his review of the evidence that a reasonable jury must have had reasonable doubt because there were other reasonable, non-illegal inferences that could be drawn from the evidence.

The Government opposes, arguing that the mere existence of other possible inferences from the evidence does not provide a basis for a new trial.   The Government also argues there was sufficient evidence established the Defendant possessed the Acura and that he possessed the firearm located therein on November 13, 2016.

The Defendant's argument is premised on a misunderstanding of the law. As explained above, it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.  *Eppolito*, 543 F.3d at 45.  The Government was not required to exclude all of the Defendant's alternate theories in order to establish guilt.  *Guadagna*, 183 F.3d at 130.  Rather, the question is whether a rational trier of fact could have found the Defendant guilty beyond a reasonable doubt when all reasonable inferences are drawn in favor of the prosecution.  *Reyes*, 302 F.3d at 52.  Here, the Defendant admits that a reasonable inference can be drawn from the evidence presented that he possessed the firearm on the day in question.  [Mem. of Law at 12–13].  Thus, the Defendant tacitly agrees that he cannot sustain his heavy burden challenging the insufficiency of the evidence.

The Court agrees with both the Defendant and the Government and finds that a reasonable inference can be drawn from the evidence, when viewed in the light

most favorable to the Government, that the Defendant possessed the firearm as charged and thus a rational trier of fact could have found the Defendant guilty beyond a reasonable doubt.  This includes the evidence connecting the Defendant to the vehicle, as he was the last registered owner of the vehicle and never reported it stolen or sold.   In addition, the vehicle contained multiple pieces of documentation that were almost all addressed to him except for a single piece of mail that was addressed to someone at the same address as the Defendant.  The jury could have also reasonably inferred that the presence of the Defendant's DNA on the firearm, including the large proportion of DNA when compared to the other contributors, shows that the Defendant physically touched and possessed the firearm.  The DNA expert explained that the amount of DNA found from a secondary transferor when compared to a direct transferor is expectingly less, specifically stating "I haven't seen an example where the primary toucher has less DNA than the secondary person" and "[t]ypically . . . the initial touching is going to give more DNA."  [Tr. 151–52, 182].  A rational jury reviewing this evidence, in the light most favorable to the prosecution and drawing all reasonable inferences in the Government's favor, could find guilt beyond a reasonable doubt.

Therefore, the Court finds that the Defendant has not established an entitlement to an acquittal under Rule 29.

### III.    MOTION FOR NEW TRIAL

### A.  Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "It long has

been our rule that trial courts 'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.'" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (citing to *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174 (1983)). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* The court is to ask if 'it would be a manifest injustice to let the guilty verdict stand." *Id.* (citing to *United States v. Reed,* 875 F.2d 107, 114 (7th Cir. 1989)). In making this assessment, the court is to consider the totality of the circumstances. *Id.* The court is required to ask: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" *Id.* Though the court is not required to assume the truth of the prosecutor's evidence in a Rule 33 motion, discretion should nonetheless be used sparingly. *Id.* The defendant bears the burden of proof on a motion for new trial under Rule 33. *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

"As a general matter, a defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." *United States v. Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (citing to *United States v. Banki,* 685 F.3d 99, 120 (2d Cir. 2012)) (internal quotation marks omitted). "In considering whether inappropriate remarks rise to the level of prejudicial error, we examine 'the severity of the misconduct, the measures adopted to cure the misconduct, and the

certainty of conviction absent the misconduct.'" *Id.* (citing to *United States v. Gansman,* 657 F.3d 85, 96 (2d Cir. 2011)).

A defendant must point to "egregious misconduct" to establish a prosecutor's comments so infected the trial with unfairness that he was effectively denied due process. *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002).

> The government has broad latitude in the inferences it may reasonably suggest to the jury during summation. . . .However, a prosecutor's statements during summation, if improper, will result in a denial of the defendant's due process rights if the statements cause substantial prejudice to the defendant. . . . In determining whether the defendant suffered substantial prejudice, we will view the allegedly improper statements in the context of the prosecutor's entire argument to the jury.

*United States v. Casamento*, 887 F.2d 1141, 1189 (2d Cir. 1989) (internal citations omitted). "[W]here, as here, the defendant did not object to the remarks at trial, reversal is warranted only where the remarks amounted to a 'flagrant abuse.'" *Coriaty*, 300 F.3d at 255 (citing to *United States v. Germosen,* 139 F.3d 120, 128 (2d Cir. 1998)).

B. Discussion

The Defendant argues that, if the Court does not grant his motion for acquittal under Rule 29, it should grant a new trial under Rule 33 due to the weakness of the Government's case along with alleged representations the prosecutor made during closing arguments that "may have misled the jury . . . ." [Mem. of Law at 14]. The Defendant points to three sets of remarks he believes may have been misleading. However, the Defendant is not claiming these statements are improper, just that closing remarks may have given the jurors an erroneous impression about the significance of the DNA expert's testimony. [Reply at 2–3].

14

*First*, the Defendant believes the following statements by the prosecution in rebuttal closing might have misled the jury and misstated the expert's testimony:

> Here, the revolver was out in the open exposed to the elements. It was sitting inside a car. You saw some of the other items that the revolver was around when it was sitting in the car. In other words, that revolver had Mr. Perez's DNA on it despite the fact that it had been exposed to the elements which we heard from Mr. Bryant will degrade the amount of DNA and decrease the amount of time that the DNA sits on the car.

[Trial Tr. vo. 2 at 41, Dkt. 140].  The Defendant argues that the remarks about the revolver being exposed to the elements may have misled the jurors because the jurors may have thought from that remark that the firearm was in the vehicle during the time the vehicle was in an impound lot with the sunroof open.  The Government argues that its statement does not contain the implications the Defendant suggests it does.

*Second,* the Defendant points to the following remarks relating to transfer DNA as applied to this case:

> Now, Attorney Calcagni also spoke about fabric. And he spoke about secondary transfers. Now, he just argued to you that Mr. Perez's DNA might have gotten on to the firearm because it was transferred from the fabric on the floor board that it was sitting on. But think about that for a minute. Think about where exactly in the car the firearm was found. It was the floor board of the front passenger side. Now, think about what you do when you sit in a car. How much are you touching, making skin contact, with the floor board of your front passenger seat. Unless you are putting your hands on the floor board a lot, unless you are riding in your own car in the passenger seat barefoot, how much of your DNA is going to end up on the floor board of the front passenger seat such that it would transfer on to any objects that are sitting there?

[*Id.* at 42].  The Defendant argues there was no testimony that touch DNA is the only way DNA can transfer to fabric.  The Government argues that this portion of

its summation does not state, explicitly or implicitly, that the only way that DNA is transferred is by touch as the Defendant claims it does.

*Third,* the Defendant points to the following remarks relating to the proportion of DNA on the firearm that was attributed to the Defendant:

> Now, defense counsel also spent a lot of time both today and yesterday speaking about secondary transfers. You heard about whether DNA could be transferred from person to person to object, from person to object to person, and every combination of those possible chains of transmissions. But secondary transfers alone do not explain how 85 percent of the DNA on the firearm came from Mr. Perez.

> Mr. Bryant told you that we would expect to see the most DNA from the primary toucher. He told you that each transfer after the primary toucher would reduce the amount of the DNA from the primary toucher that we would expect to find on the object. And he told you that the more that you touch an object, the more DNA you leave behind. That is, you'll leave more DNA behind if you are handling an object thoroughly and frequently and for long periods of time than you do if you just slide by an object and touch it once in a fleeting pass.

> So even if the firearm had been transferred from person to person to object or from person to object to person or any combination that attorney CALCAGNI has given you, 85 percent of the DNA still came from Mr. Perez after all of those transfers.

> Now, think about what that number, 85 percent, tells you about whether Mr. Perez was in possession of the firearm. In order to end up with 85 percent, Mr. Perez must have been touching the firearm and touching it a lot. And if you are touching something, you're touching it a lot, if you're handling it, if you're holding it repeatedly over a period of days, of hours, you have that object in your possession and you are exercising control over it.

[*Id.* at 42–44]. The Defendant argues that these remarks give the erroneous impression about the significance distribution calculations because the expert testified that the 85% might be different if the swab was cut differently. The Government argues that its statements accurately characterize the expert's

testimony and was free to emphasize the portions of the testimony that were particularly relevant to the arguments it sought to present.

Here, none of the Defendant's arguments, individually or collectively, warrant a new trial under Rule 33.  With respect to the sufficiency of the evidence, there was competent, satisfactory, and sufficient evidence that support's the jury's finding of guilt beyond a reasonable doubt, as detailed more thoroughly in the above discussion denying the Defendant's motion for acquittal.  The jury had sufficient evidence to draw a reasonable inference the Defendant possessed the firearm that night based on the totality of the evidence, including the DNA evidence and the Defendant's connection with the vehicle in which the firearm was located.

In addition, none of the rebuttal summation remarks that the Defendant points to were improper, as he admits.  The first two sets of remarks the Defendant challenges as potentially misleading are not misleading at all.   Rather, the Defendant is adding between-the-lines implications that are simply not there.  The Government never said the firearm was left in the vehicle for the over two-month period of time the vehicle was in the open impound lot with an open sunroof.  Nor can it be reasonably said the Government implied such evidence existed.  Also, the Government never said that the only means in which DNA is transferred is by touch DNA.  In fact, immediately after discussing the touch DNA means of transfer it discussed secondary transfer DNA in the context from the person to object to object.  [*Id.* at 42].

Lastly, the Defendant's challenge with respect to the summation remarks about the proportion of DNA found on the firearm miss understands the

prosecutor's role.   The prosecutor has broad latitude in the inferences it can suggest.  *See Casamento*, 887 F.2d at 1189.  The expert's testimony was that if a different portion of the swab was cut it was "possible" that a different distribution of contributors could result if another piece of the swab was cut.  [Trial Tr. vol. 2 at 171].  He did not testify that it would in fact be different or whether that difference would have shown less of a contribution from the Defendant.   From the only evidence of distribution presented was that the DNA profile associated with the Defendant was an 85% distribution as compared to the other contributors.   An inference that some other favorable to the Defendant distribution existed would require assumptions not supported by evidence.   Thus, the Government's discussion about the 85% distribution was clearly not improper, nor could it be deemed misleading.

As stated, the challenged summations statements were not improper nor misleading, but even if they were, they are not so severe or egregious to warrant a new trial even when considered along with the strength of the Government's case. There is no showing that these remarks were substantially prejudicial.  Further, a curative instruction was given during the jury charge where the Court instructed the jury that: "Closing arguments or other statements or arguments of counsel is not evidence. If your recollection differs from the way counsel has stated the facts, then your recollection controls."  [Jury Charge at 19, Dkt. 116].  In other words, even if the prosecutor misstated evidence, the jury was explicitly told to not rely on either counsel's statements as evidence.   No argument has been made as to

why this instruction would not cure what the Defendant suggests was misleading about the Government's rebuttal summation remarks.

Therefore, the Defendant has not sustained his burden of establishing manifest injustice warranting a new trial under Rule 33.

IV.     CONCLUSION

For the above reasons, the Court denies the Defendant's Motion for a New Trial and Motion for Acquittal.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: December 20, 2021